[No. 2904.]

## S. W. OGLE *v.* THE STATE.

1. JURY LAW—NEW TRIAL.—The mere separation of a jury pending verdict is not cause for new trial. In addition to the separation in contravention of law, it must be further made to appear that by reason of such separation probable injustice to the accused has been occasioned. See the opinion *in extenso* for facts of the separation of a jury *held* not to have

prejudiced the rights of the defendant, and therefore insufficient cause for new trial.

2. PRINCIPALS IN CRIME—MANSLAUGHTER—CHARGE OF THE COURT.—ACCOMPLICE under our Code is the same as an accessory before the fact at common law. As at common law there could be no accessories before the fact to manslaughter, so under our Code there can be no accomplice to manslaughter. But at common law there might be a principal in the second degree to manslaughter, and under our Code the offense of manslaughter admits of principals. Hence the court erred in charging the jury that "the law of principals does not apply to cases of manslaughter," but the error being in favor of the accused, it is not revisable by this court.

APPEAL from the District Court of Falls. Tried below before the Hon. Jo. Abbott.

The indictment in this case was joint against the appellant, Joe Brown and John Kennedy, and charged them with the murder of Allen and William Sams, in Hill County, Texas, on the fourth day of March, 1881. The appellant being alone upon trial was found guilty of murder in the first degree, and his punishment was assessed at confinement in the penitentiary for the term of ninety-nine years.

Mrs. Sams, the mother of Allen and William Sams, testified, for the State, that her two sons left her house in Hill county to go to Waxahachie to sell their cotton and purchase lumber on the Wednesday preceding their death. They were to have been at home on Friday. Their failure to return on Friday night occasioned the witness much uneasiness. On Saturday morning, looking out for them, she saw some objects she could not distinguish near their corn pens. She despatched her little deaf and dumb boy to ascertain what they were. The little boy shortly returned with the information that he had found the dead bodies of his brothers. Witness, her husband and Allen's wife went immediately to the bodies. Allen's wagon stood some yards from the corn pen, the horses unharnessed and tied to the standard, the tongue down. Allen's dead body lay near the hind wheel. He had been shot through the back. There was a scratch on his neck. His tongue was swollen and seemed to have been cut. The clothes were all burned off the body, and the grass had been burned from the ground around him. The grass for twenty feet in the direction of the corn pens was bloody in spots, and the ground showed evidences of a struggle. William's wagon had stopped about seventy-five yards from where

Allen's body lay. His body was found about half way between his wagon and the corn pen, and his wagon was on the opposite side of the corn pen from Allen's wagon. The traces of but one of his horses was loosed. William had been shot through the breast, his left arm was bruised and his neck broken. Allen and William had commenced to improve the place where the corn pen was—had built the corn pen and put corn in it the previous year. They had some lumber on the ground to improve with, and the lumber they had on their wagons was to be used for the same purpose. Witness's husband had since died.

Ben. Forrest, a freedman, testified, for the State, that he lived about six miles due east from the scene of the killing, and about a half mile from Doctor Schofield's house. About three o'clock on the evening of March 4, 1881, three men, one driving a wagon, and two horseback, driving a drove of about twelve horses, passed the witness's house, going toward the place of the killing. They were then traveling between a walk and a trot. There was a paint horse. The witness also thought that the bunch of animals included three mules. Witness did not know the size of the men. Booker lived about a half a mile from Doctor Schofield, east from the witness's house.

Booker testified, for the State, in almost the same words as did Ben. Forrest. Forrest and Doctor Schofield both lived a short distance east of witness.

Doctor Schofield was the next witness for the State. He testified that he lived on the public road, about six miles north of Hillsboro. Late in the evening of March 4, 1881, he saw one man in a wagon and two° horseback, driving a small drove of horses—some six or seven head—pass his house, going in the direction of the place where the killing occurred. They were traveling rapidly. There were a paint, a bay, two or three grays, and, the witness thinks, a dun horse in the bunch. In the direction they were going, to reach the scene of the killing, they would have to pass, in the order named, the houses of Brady, Bains, Stoker, where Hodges lived, and witness's son, where the witness thinks Willis Grigsby lived at the time.

The witness went to the bodies between nine and ten o'clock on Saturday, the morning after the killing. He described the wounds in the bodies, their location, and that of the wagon and condition of the ground, etc., as Mrs. Sams did. He found Mr. and Mrs. Sams and Mrs. Allen Sams on the ground when he got there. Witness and those with him traced some perfectly fresh

horse tracks and wagon tracks from where they turned off the main road up to the corn pen. The parties who went up to the corn pen came from the southwest, and left going in a northeast direction. The party seen by the witness on the evening before the killing, as stated, were traveling in the direction of this place. Witness saw where horses had been fed around the corn pen on the ground. Small patches of blood were found on the ground, at intervals, for ten or fifteen steps from Allen's body. The grass had been burned off. The corn pen was about a half mile distant from old man Sams's, and was in plain view from every direction.

Cross-examined, the witness stated that the wagon which was traced up to the pen drove off across some plowed ground, and across the road, about two hundred yards from the pen, and struck a hedge about two hundred and fifty yards from the pen. It then turned down the hedge, to an opening through which a road passed, having described a triangle whose base was the hedge. The distance from the hedge to the opening was about two hundred and twenty-five yards. Mrs. Kirkpatrick lived about a mile and a quarter east from the pen.

Willis Grigsby testified that, at the time the Sams boys were killed, he lived on Will Schofield's place, about a half mile from where the killing occurred. Just after supper, between seven and eight o'clock, he heard the report of a gun or pistol in the direction where the killing occurred.

John Brady testified, for the State, that a little before sundown on the evening of March 4, 1881, he saw a man in a wagon and two men on horseback driving a bunch of loose stock, traveling in the direction of the place where the Sams boys were killed. There was a paint horse in the bunch. Witness lived west of Doctor Schofield's house, and between that house and the place of killing.

F. M. Bain, another witness who lived west of Doctor Schofield, testified that three men with a wagon and such a bunch of horses as described by other witnesses passed his house going in the direction of the Sams boys' improvements, about sundown or near night. The witness had since seen one of those men, the one called John Kennedy, in jail and in the court house. He did not know that he could identify either of the other two. Witness noticed Kennedy because of his resemblance to his, witness's, son.

John Chilton, J. M. Hodges and Mr. Rawlan testified that

they too saw such a party as that described by the previous witnesses pass along the road indicated, on the evening in question. One of those men Hodges afterwards saw under arrest at Brown's ranch, giving the name of John Kennedy. Witness last saw this man on trial for this same offense in this same court house.

William Reavis testified, for the State, that he saw the bodies of the deceased on the ground of the killing. William Sams lay with his hand in his overcoat pocket. He had a pistol with one chamber discharged in his pants pocket. The parties who stopped at the corn pen went off on the road that leads to Dallas and Waxahachie. The route to Brown's ranch followed this road until it passed Edrington's, where it left the road and crossed the prairie. Witness followed the tracks until they passed Edrington's, the point where they should have left the main road to take the shortest route to Brown's ranch. Brown's ranch could be reached the way the track led over a better though somewhat longer route.

White Turner testified, for the State, that he attended a party at Mrs. Kirkpatrick's on the night of the killing. Just before he reached Mrs. Kirkpatrick's house he met three parties—two in a wagon and one driving loose stock—traveling north toward Brown's ranch as rapidly as the wagon and loose stock could travel. The animals in the wagon were going as fast as they could trot and gallop. This was about an hour after dark.

George Kirkpatrick testified, for the State, that he went to Waxahachie with the Sams boys, and returned with them on the evening of March 4, 1881. Allen's wagon was loaded with lumber, and William's with shingles. Allen went on in the direction of his improvements; William stopped at witness's house, got supper and remained about an hour. An hour or more after William left, the witness heard a wagon going past his house very rapidly, the parties with it singing. Very shortly after the wagon passed White Turner arrived at witness's house. The place where the Sams boys were killed was about a mile and a half distant from witness's house.

William Garret testified, for the State, that he lived within a half mile of the place of killing. A short time after dark the witness heard the report of a gun or pistol, fired directly at the place where the bodies were found.

William Berry testified, for the State, that he knew Joe Brown, John Kennedy and Mark Sullivan. (It is shown by other tes-

timony that Mark Sullivan was the assumed name under which the defendant formerly passed.) These parties lived together at Brown's ranch, two and a half miles from witness's house. In going to Brown's place from Edrington's, one could pass witness's place by going through a pasture. Witness learned of the killing of two men about nine o'clock on the night that the killing occurred, and next morning learned that the men killed were the Sams boys. Joe Brown was witness's brother-in-law. Witness saw the defendant at his, witness's, house a few days after the killing. He came to the house and left it just before day. Joe Brown came to witness's house, horseback, on the night of the killing, and it was while he was there that witness heard of the killing of two men.

W. A. Chapman testified, for the State, that he lived in a mile of and west of Brown's ranch. He spent the evening of the killing with a neighbor. Starting home, between nine and ten o'clock, he heard and saw a wagon driven rapidly into the creek bed. When the wagon mounted the other side, some thirty or forty steps from the witness, he could see that one man was driving a wagon, and another some loose stock of horses and mules. Some of the stock were light colored animals. Witness did not recognize the parties. He had not seen the defendant for a month previous to this. Between that point and the place where the Sams boys were killed several people lived on the road. It was but a short distance to Brown's ranch from the point where the witness saw these parties. Some one in the wagon called out, "Set 'em up," which expression among stock men is equivalent to "drive them up."

Ben Berry testified that he lived at Brown's ranch. He knew Brown and John Kennedy, and he knew the defendant as Sullivan. He had since learned the defendant's name to be Ogle. Witness did not hear of the murder of the Sams boys until a day or two after it occurred. Witness was at Brown's ranch on the night of the killing, together with Mrs. Brown, Willie Smith and Bragg. Brown, Kennedy and the defendant came to the ranch that night, and left together the same night about twelve o'clock. The witness afterward saw Brown at his, witness's, father's house, in the night. He afterward, at his brother's house, saw the defendant. He came there and left there in the night. Brown, Kennedy and the defendant had been gone from the ranch about three weeks when the killing occurred. Defendant and Kennedy came to the ranch that night in a wagon,

and Brown came on horseback. Witness did not know what, if anything, they brought with them, but next day saw some horses about the place, including a gray and a paint horse. The witness had never before seen the paint horse. Defendant and Kennedy came into the house first that night. They remained about an hour, went out and returned with Brown. It was several days after that that witness first noticed the paint horse.

Cross-examined, the witness said that he did not go out of the house when the parties came. Defendant and Kennedy came first, about an hour before Brown came. Witness went to sleep about twelve o'clock, when Brown, Kennedy and defendant were all present. They were gone when he woke up. It was a week or more before witness again saw Brown. Brown had considerable stock.

Sheriff Cox testified that he used every means in his power to apprehend the defendant after the killing. He went to Brown's ranch and found and arrested Kennedy on the Sunday night after the killing. He went to Fort Worth in response to a telegram and met the sheriff of Ellis county with the defendant and the dead body of Brown.

Squire Vinson testified, for the State, that on the twenty-second day of January, 1881, a complaint was filed in his court charging the defendant with the theft of cattle. The witnesses whose names appeared on the back of the complaint were William Reavis, Allen and William Sams, John Anstead, — Forbes, A. D. Grant and R. O. Kirkpatrick. Defendant could never be found, and was never arrested on said complaint.

The motion for new trial presented the questions discussed in the opinion.

No brief for the appellant has reached the Reporters.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE. 1. One of the grounds of defendant's motion for a new trial is that, after his cause had been submitted to the jury, and pending its consideration by the jury, one of the jurors separated from the other members of the body, and remained separate from them about twelve hours. It appears from affidavits filed, and read in opposition to this ground of the motion, that while the jury was deliberating upon the case one of the members thereof became quite sick, and it became

necessary to give him attention, and he was separated from the other jurors during the night, but was all the time during such separation in charge of a deputy sheriff, and was not spoken to by any one about the case, nor did he speak to any one about the case, nor was the case spoken about in his hearing during said time. It is shown that such separation could not probably or reasonably have occasioned any injustice to the defendant.

The mere separation of a jury is not cause for a new trial. In addition to the separation in contravention of the law (Code Crim. Proc., Art. 687), it must be further made to appear that by reason of such separation probable injustice to the accused has been occasioned. (Code Crim. Proc., Art. 777; *Davis* v. *The State*, 3 Texas Ct. App., 91; *Cox* v. *The State*, 7 Texas Ct. App., 1; *West* v. *The State*, 7 Texas Ct. App., 150; *Russell* v. *The State*, 11 Texas Ct. App., 288.) In this case the separation of the jury was not of that character, or accompanied by any of the circumstances which constitute a ground for a new trial.

2. No errors in the charge of the court, or other errors in the proceedings in the case, are complained of by the defendant. We have, however, carefully considered the charge of the court, statement of facts, and all other parts of the record, and we have found no error of which the defendant can be heard to complain. His conviction, as shown by the record, has been obtained upon a fair and impartial trial, conducted in all respects in strict accordance with the forms of law.

3. We find one error in the charge of the court which we think it advisable to call attention to. The learned judge states in his charge that "the law of principals does not apply to cases of manslaughter." This was doubtless a mere clerical mistake in the charge. There is no such exception made in the provisions of our Code. (Penal Code, Arts. 74 to 78.) There can be no *accomplice* to manslaughter, and it was this rule of the law, perhaps, that the learned judge had in his mind when he penned the instruction quoted. (Penal Code, Art. 85.) An accomplice under our Code is the same as an accessory before the fact at common law. (Penal Code, Art. 79; 3 Greenl. Ev., sec. 42; 1 Bish. Cr. Law, sec. 673.) And at common law there could be no accessory before the fact to manslaughter, because manslaughter is an offense which is considered in law sudden and unpremeditated. (1 Hale P. C., 613–615; 4 Black. Com., 35; 1 Bish. Cr. Law, sec. 678.) But at common law there might be a principal in the second degree to manslaughter, such principal being one

who did not with his own hand commit the act, but was present aiding and abetting it (3 Greenl. Ev., sec. 40; 1 Bish. Cr. Law, sec. 678), and in our opinion such is the law under our Code. (*McMahon* v. *The State, ante* 357.)

But this error in the charge is immaterial in this case, because it was favorable to the defendant, and he could not be heard to complain of it, nor, in fact, has he complained of it. We have noticed this portion of the charge for the sole purpose of calling attention to what we believe to be the law upon a question which has not before been decided by this court.

Finding no error in the record of which the defendant can complain, the judgment is affirmed.

*Affirmed.*

Opinion delivered May 31, 1884.